OPINION OF THE COURT
Lorraine S. Miller, J.
Petitioner, the City of New York (the City), commences this *1030 CPLR article 78 proceeding seeking payment of $8,050,681 withheld from it for its operation of adult shelters on the grounds that respondents’ failure to release this sum despite the City’s present compliance with agency regulations is arbitrary and capricious and in violation of Social Services Law § 153 and 18 NYCRR part 486.
FACTS
Pursuant to Social Services Law § 153, New York State (the State) pays 50% of the operating costs of adult shelters. (For a discussion of the history of State reimbursement of municipal costs for homeless shelters see, City of New York v Blum, 121 Misc 2d 982.) Under Social Services Law § 20 and 18 NYCRR 486.6, the New York State Department of Social Services (DSS) may withhold or deny reimbursement to local social services districts if any violation is not corrected, or an appropriate plan for correction is not submitted, within 30 days of a notice of violation. The amount withheld may be up to the entire State reimbursement for the facility, "from the 31st day after the notice of violation until the department notifies the local district, in writing, that the facility is in compliance” (18 NYCRR 486.6 [c]). Upon written notice to the local social services district, the DSS "may deny up to the entire amount of the withheld reimbursement”, if the local district "does not correct the violations cited * * * within the time periods specified in the notice of withholding” (18 NYCRR 486.6 [d]).
The City seeks funds withheld during the years between 1985 to 1987 as a result of its failure to comply with the fire safety, sanitation and maintenance requirements for the operation of three homeless shelters known as the Greenpoint Shelter Care Center for Men (Greenpoint), the Flushing Women’s Armory (Flushing) and the Bushwick Shelter Care Center for Women (Bushwick), respectively.
In a letter dated July 27, 1984, the DSS notified the City that its grant for Greenpoint would be reduced. The DSS withheld two thirds and later one third of Greenpoint’s shelter amount for a total sum of $6,430,808 from April 1984 to September 1988. On February 11, 1985, the DSS notified the City that its grants for Flushing and Bushwick, respectively, would be reduced. Flushing lost one third of its total State contribution of $974,365 from January 1985 to March 1988; whereas, Bushwick lost one third of its grant for a total of *1031 $645,508 for the period between January 1985 to September 1987.
All three of the DSS’s notification letters to the City represented that failure to correct the violations may result in a loss of these withheld funds and that full compliance with the Department’s directives would result in return of all retained moneys. None of the notification letters presented give a definite date for completion of necessary repairs.
The City has corrected the violations which prompted the DSS to stop withholding prospective funding from these three centers. However, the DSS has never issued a separate written notice to petitioner informing it that the DSS would not return any previously retained funds due to excessive delay, as required by 18 NYCRR 486.6 (d). The record does reflect that there have been a number of shelter reinspections, and that the City and the DSS have met in order to resolve the reimbursement issue.
This proceeding is complicated by the fact that the DSS had no objection to the release of withheld sums. In a letter dated August 3, 1987 the DSS wrote to respondent the New York State Division of the Budget (DOB) asking it to release $1.2 million for three other shelters that petitioner brought into compliance. At that time, the DSS noted that four additional shelters including those centers involved in this proceeding had not complied with all the required corrections. The DSS’s position was that it would request the remaining $4 million needed to reimburse the City for the other shelters in the 1988-1989 budget.
The DOB responded to the DSS’s letter stating that the State would only release $1.2 million for shelters already in compliance but that it would not release $4.8 million for funds withheld as the result of the infractions dating back more than three years. In addition, the DOB criticized the DSS for representing to the City that all withheld funds would be returned, before the DSS sought approval from the DOB.
Despite further attempts at negotiation, the parties did not resolve the issue of reimbursement. In a letter dated January 23, 1990, the City, through its Office of Human Resources Administration (HRA), requested from the DSS a return of all withheld amounts pursuant to Social Services Law § 153 (6) (a) (see also, City of New York v Blum, supra, at 988-989). The exact actions taken by the parties after that point are unclear. It appears that the DOB refused to release any more funds *1032 adopting a position that withholding should be used as "an incentive to achieve compliance as quickly as possible.” No written response to HRA’s reimbursement request has been presented to this court. The City then commenced this proceeding in May 1993.
Respondents raise three objections of law arguing that the petitioner fails to state a cause of action, that estoppel cannot be raised against the State or its agencies, and that the DOB must concur in any release of funds by the DSS to local social services districts and that the DOB declines to give its concurrence because the petitioner failed to comply with the State’s standards for homeless shelters and had significantly delayed correcting such deficiencies.
In reply, the City maintains that no rule has even been promulgated which requires the corrections to be made within a short time period and that respondents never communicated such a policy to petitioner. The City also represents that the long delay was caused by the fact that the City is required by law to put out a call for competitive bidding before engaging contractors and that this process is time consuming. No documents relating to the competitive bidding process have been presented to this court.
DISCUSSION
The court rejects respondent’s first objection of law that petitioner fails to state a cause of action. The City, as the local social services district, has "the right to a judicial review of the decision to withhold or deny reimbursement in accordance with the provisions of article 78 of the Civil Practice Law and Rules” (18 NYCRR 486.6 [e]; see also, Matter of Gross v Perales, 72 NY2d 231). Thus, this proceeding is sufficiently stated in respect to the DSS (City of New York v Blum, 121 Misc 2d 982, 984, supra; Social Services Law § 20 [3] [e], [f]).
Other courts have dismissed CPLR article 78 proceedings which seek reimbursement of withheld funds from the DOB on the grounds that this agency represented that it has no authority to make or deny welfare reimbursements without express authority from the DSS and that the governing regulations apply specifically to the DSS and not to the DOB (see, Matter of City of New York v Perales, NYLJ, Sept. 27, 1991, at 23, col 1 [Sup Ct, NY County, Miller, J.], affd 195 AD2d 419).
However, this court shall not dismiss the proceeding against the DOB in this instance because said respondent now *1033 maintains that it must concur in any decision by the DSS to reimburse funds to local social services districts (see, City of New York v Blum, supra). Moreover, the court has the power to convert a CPLR article 78 proceeding into one for declaratory action (CPLR 103 [c]) and this petitioner states sufficient facts for a declaratory action concerning the scope of the DOB’s power of review (CPLR 3017 [b]). Therefore, the issue of whether the DOB may deny the release of funds withheld by the DSS is properly before this court and the petition shall not be dismissed against this respondent.
The court rejects so much of respondent’s third objection of law which presumes that the DOB may review a determination that is within the discretion of the DSS as provided in Social Services Law §§ 153, 20, and 34.
The NY Constitution clearly delineates the role of each branch of government in the budgetary process (NY Const, art VII, §§’2, 4, 7; see also, Matter of County of Oneida v Berle, 49 NY2d 515, 522-523). The executive branch "may not override enactments which have emerged from the lawmaking process” since the executive branch "is required to implement policy declarations of the Legislature, unless vetoed or judicially invalidated” (supra, at 523). In particular, the executive branch "possesses no express or inherent power — based upon its view of sound fiscal policy — to impound funds which have been appropriated by the Legislature” (supra, at 524).
The Director of the Budget (Budget Director) has a duty to see that the appropriated funds are distributed properly. In particular, the Budget Director must assist the Governor in respect to "the formulation of the budget and the correlating and revising of estimates and requests for appropriations of the civil departments,” and in "the investigation, supervision and coordination of the expenditures and other fiscal operations of such department” (Executive Law § 180). The Budget Director’s approval is not a mere ministerial act (Matter of Alliance for Progress v New York State Div. of Hous. & Community Renewal, 141 Misc 2d 365). Section 49 of the State Finance Law requires that no moneys for lump-sum appropriations for maintenance and operation, inter alia, "shall be available for payments * * * until a schedule of positions and salaries and the amounts to be available * * * for the expenses of maintenance and operation * * * shall have been approved by the director of the budget”.
However, section 49 does not give the DOB the power to *1034 determine matters which the Legislature specifically placed in the control of other entities (see generally, Matter of Friedman v D’Antoni, 50 AD2d 9, affd 41 NY2d 1004). Rather, section 49 creates, at most, "a situation where the money appropriated may not be paid until the appropriate schedule has been approved by the director and his certificate of approval filed” (supra, at 12). Therefore, respondents have not shown that the DOB may review a determination by the DSS in respect to whether an agency is or is not in compliance with State and local welfare regulations.
In New York, the NY Constitution "imposes a duty on the State and its subdivisions to aid, care for, and support the needy” (Doe v Dinkins, 192 AD2d 270, 276; NY Const, art XVII, § 1; see also, Jiggetts v Grinker, 75 NY2d 411). This duty to care for the needy is so important that it often overrides financial concerns (see, Matter of City of New York v Perales, supra [the State should not impose penalties for the sole purpose of recouping the maximum sum possible, from the City]).
In addition to the constitutional mandate, the declared policy of the State "is to maintain adult care facilities, i.e., shelter facilities, of the highest quality (Social Services Law § 460)” (Wilkins v Perales, 128 Misc 2d 265, 269, affd 119 AD2d 1018, lv denied 68 NY2d 612). The DSS, in particular, has a "comprehensive responsibility for the development and administration of programs and the implementation of a standards of operation for all facilities” as well as the discretion to formulate policy and establish priorities (supra; see also, Social Services Law § 34 [f]; see also, §§ 460-d, 461-a).
The court finds that under the present law and regulatory scheme, the DSS is the only State agency which is empowered to determine if a local social services district is in compliance with the regulations governing certification and operation of adult care facilities. Moreover, the DSS is the only department which may impose penalties on a local district (see, City of New York v Blum, supra, at 987). Under 18 NYCRR 486.6 (d), the DSS also has the sole discretion, upon proper notice to the commissioner of the local district, to deny reimbursement of withheld funds on the grounds that the local district failed to timely correct violations as specified.
Although the DOB may object to a release of funds that does not comply with the State’s budgetary procedures, it may not take any action which is beyond its particular scope of *1035 discretion. Here, respondents have not discussed whether or not the $4 million request by the DSS was in compliance with the State’s budgetary procedures and the court cannot make a finding as to those requirements. However, it is clearly established that the DOB is not empowered to determine whether the City was in compliance with welfare regulations or whether petitioner corrected violations in a timely manner.
Therefore the petition against the DOB is granted to the extent of finding that the DOB’s refusal to release funds as a result of any alleged delay by the City is improper and in violation of the DOB’s mandate under present law. This finding does not effect either the City’s or the DSS’s responsibility to comply with all appropriate laws concerning appropriation of funds.
The court shall not, however, order an immediate return of the moneys withheld by the DSS. The representation by the DSS that it would return all sums upon completion was made, in some cases, years before the actual date of the City’s compliance. Petitioner may not invoke the doctrine of estoppel against the DSS in order to prevent it from discharging its statutory duty of review. (See, Matter of New York State Med. Transporters Assn. v Perales, 77 NY2d 126, 130; Matter of Daleview Nursing Home v Axelrod, 62 NY2d 30, 33.) As for the issue of reliance, the City has failed to show undue prejudice since the original notices plainly indicated that there was a possibility that withheld funds could be lost permanently if petitioner failed to comply with the DSS’s directives (supra).
However, the court is unable to determine at this juncture whether the DSS’s failure to release funds is arbitrary and capricious since the DSS never issued a written finding to HRA’s 1990 request for reimbursement in accordance with 18 NYCRR 486.6 (d). Given the DSS’s clear mandate to review the issue of timely compliance, the petition is granted to the extent of ordering the DSS to consider HRA’s request and to determine whether petitioner’s claim, that the delay was not due to negligence but was the result of the City’s mandatory competitive bidding process, is justified.