OPINION OF THE COURT
Richard F. Braun, J.
This is a proposed class action for a declaratory judgment and injunctive relief. Plaintiffs move for an order, pursuant to CPLR 902, to allow this action to proceed as a class action. Plaintiffs propose defining the class as: “consisting of themselves and of all other inmates (a) who are currently confined or who will be confined in City jails, (b) whose period of confinement in City jails lasts 24 hours or longer, and (c) who, during their confinement in City jails, have received, are receiving or will receive treatment for mental illness.” Plaintiffs state that, for the purpose of defining the class, the definition of “mental illness” is “an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation.” (Mental Hygiene Law § 1.03 [20].) Plaintiffs subsequently brought a separate motion for a preliminary injunction enjoining defendants from violating Mental Hygiene Law § 29.15, 14 NYCRR 587.1 et seq., and NY Constitution, *423 article I, §§ 5 and 6, and enjoining defendants to provide plaintiffs and the class that they seek to represent with adequate discharge planning in compliance with accepted psychiatric standards and the aforesaid statute, regulations, and constitutional provisions.
When this action began, plaintiffs were inmates at Rikers Island, except for one who had been moved from Rikers Island to the Forensic Psychiatric Ward at Bellevue Hospital. They were all receiving treatment for significant mental health problems while incarcerated. They each seek discharge planning, pursuant to Mental Hygiene Law § 29.15 and 14 NYCRR 587.1 et seq., before they are released from jail.
Each year approximately 25,000 pretrial detainees, sentenced individuals, and other inmates receive mental health care while incarcerated in New York City jails. These services include the prescription of psychotropic medications, and inpatient and outpatient individual and group therapy. Defendant St. Barnabas Hospital, a private entity, provides most of the services pursuant to a contract with defendant New York City Health and Hospitals Corporation (HHC), which provides the balance. Upon release from Rikers Island, generally inmates are not provided any mental health services, government benefits assistance, housing referrals, or other services, or planning therefor. Rather all that is done for inmates released from Rikers Island is that they are taken by bus to the Queen Plaza subway station between 2:00 a.m. and 6:00 a.m. and given $1.50 plus two subway tokens or a two-fare MetroCard. When inmates are released from court, they are free to leave or return to Rikers Island to pick up any personal belongings that the inmates may have left there.
The average daily population in the New York City jails in the 1999 fiscal year (through Apr. 8, 1999) was 17,897. The average stay for pretrial prisoners was 43.1 days and for sentenced inmates 33.2 days. In 1998, there was a total of 129,998 inmates in those jails. In 1997, about 33,000 prisoners, which was about . 25% of the total, received mental health treatment in the New York City jails. Some received outpatient treatment while in jail, some were placed in segregated mental health treatment units, and some were treated in psychiatric wards of New York City hospitals.
Plaintiffs assert three causes of action. The first is under Mental Hygiene Law § 29.15 (f), which provides in part: “The discharge * * * of all clients at developmental centers, patients at psychiatric centers or patients at psychiatric inpatient ser *424 vices subject to licensure by the office of mental health shall be in accordance with a written service plan prepared by staff familiar with the case history of the client or patient to be discharged * * * and in cooperation with appropriate social services officials and directors of local governmental units.” The second claim is pursuant to 14 NYCRR 587.1 et seq. which consists of rules of the New York State Department of Mental Hygiene, Office of Mental Health, as to the operation of outpatient programs. The third cause of action contains the claims under the New York State Constitution.
In order to obtain certification of a class, a plaintiff must demonstrate the five prerequisites under CPLR 901 (a), and, if so, then the court must consider the factors under CPLR 902 (Ackerman v Price Waterhouse, 252 AD2d 179 [1st Dept 1998]). Certification of a class is appropriate here. Plaintiffs have complied with CPLR 901 (a), and the court has considered the CPLR 902 factors.
Defendants only challenge certification of a class on four grounds. Defendants argue first that the requested class definition is overly broad. Second, defendants contend that individual questions predominate over common ones. Third, defendants argue that the governmental operations rule makes class certification unneccesary and inappropriate. Last, defendants assert that the representative plaintiffs cannot adequately represent the class because of plaintiffs’ mental health problems, and inasmuch as their release from jail will make their claims moot.
Even though there may be some questions of law or fact which affect some individual members of the class but not others, such as relate to the facts that some members receive outpatient care and some are in segregated units, that is not a reason to deny class certification (Weinberg v Hertz Corp., 116 AD2d 1, 6 [1986], affd 69 NY2d 979 [1987]). CPLR 901 (a) (2) only requires that the common questions predominate over the individual ones, which is the case here.
The governmental operations rule provides that stare decisis would protect others similarly situated to named plaintiffs if relief were afforded to them because government defendants can be expected to obey a court order issued for individual plaintiffs to the benefit of all members of a proposed class, and thus a class action is not needed (see, Matter of Jones v Berman, 37 NY2d 42, 57 [1975]). First, as plaintiffs point out, the two individual defendants, St. Barnabas Hospital and Dr. Ronald Gade, are not subject to such rule. Second, the *425 governmental operations rule does not apply where the government entity fails to propose any relief that would protect the class plaintiffs; where, due to indigence or otherwise, the class plaintiffs would likely be unable to file suit to protect themselves; or where the class plaintiffs face an immediate threat from the condition for which a remedy is sought (New York City Coalition to End Lead Poisoning v Giuliani, 245 AD2d 49, 51 [1st Dept 1997]). All those factors are found here. If the class plaintiffs are not afforded the relief sought, the expert evidence submitted by plaintiffs shows that, without any adequate discharge planning, they face the immediate threat of psychological relapse, with a greater likelihood of the concomitant return to lives of drug and/or alcohol abuse, homelessness, lawlessness, and danger to themselves and/or others.
As to the argument of defendants that, due to the mental health problems of the representative plaintiffs, they are unable to adequately represent the class, upholding that argument would put the representative plaintiffs in a classic Catch 22: they and the class members need to sue to obtain assistance for their psychiatric problems, but they would not be allowed to sue because of them. Inmates with psychological problems at correctional facilities have been allowed to be class representatives in other litigation (see, e.g., Langley v Coughlin, 715 F Supp 522, 531, 555 [SD NY 1989]; Anderson v Coughlin, 119 FRD 1 [ND NY 1988]). If any of the plaintiffs cannot adequately present his or her claims and/or those of the class due to mental illness, the court can appoint a guardian(s) ad litem, pursuant to CPLR 1201. Furthermore, defendants have not challenged the adequacy of the attorneys for plaintiffs who are prosecuting this action for these plaintiffs and the class. As to defendant’s argument that the claims of the representative plaintiffs will become moot, due to the large number of members of the proposed class for whom defendants are concededly not performing discharge planning, the issue will certainly recur, probably on a daily basis. Thus, mootness is not a reason to deny certification of a class here (Matter of Lamboy v Gross, 126 AD2d 265, 273 [1st Dept 1987]; Matter of George v Goldrick, 136 Misc 2d 258, 261 [Sup Ct, Rockland County 1987] [certification of a class action was granted, and the court held that the action was not moot where the petitioner and intervening petitioners were no longer incarcerated in the subject jail]).
Therefore, a class should be certified, but the proposed class is in fact too broad. The definition includes inmates who were given outpatient mental health treatment only once or twice. *426 They may no longer need treatment. Thus, some of the members of the proposed class would not be entitled to a discharge plan. Therefore, the proposed definition must be modified to include only those who would be so entitled, pursuant to Mental Hygiene Law § 29.15 (f) or 14 NYCRR 587.16. Plaintiffs will have to settle an order with an appropriate class definition, pursuant to CPLR 903 and 22 NYCRR 202.48.
In order to obtain a preliminary injunction, a plaintiff must show “(1) the likelihood of success on the merits; (2) irreparable injury absent granting the preliminary injunction; and (3) a balancing of the equities.” (Grant Co. v Srogi, 52 NY2d 496, 517 [1981].) Plaintiffs have demonstrated their entitlement to preliminary injunctive relief.
Defendants assert that plaintiffs do not have a likelihood of success on the merits because plaintiffs do not have a private right of action to have Mental Hygiene Law § 29.15 (f) and 14 NYCRR part 587 enforced for the benefit of plaintiffs and the class. Defendants argue-that Mental Hygiene Law § 31.21 (a) only gives standing to the Attorney General of the State of New York to sue for injunctive relief. That provision only applies to injunctions sought in relation to article 31 of the Mental Hygiene Law, which plaintiffs are not seeking. Rather plaintiffs are seeking an injunction to enforce a provision of article 29 of the Mental Hygiene Law, to wit, section 29.15 (f), as well as 14 NYCRR part 587 and NY Constitution, article I, §§ 5 and 6.
In any event, plaintiffs and defendants argue at great length as to whether there is a private right of action under Mental Hygiene Law § 31.21 (c). Even if plaintiffs were seeking relief under Mental Hygiene Law article 31, Mental Hygiene Law § 31.21 (c) shows that there is a private right of action to seek injunctive relief thereunder. Mental Hygiene Law § 31.21 (c) provides in pertinent part: “Notwithstanding any limitation in the civil practice law and rules, such court may, on motion and affidavit, and upon proof that such violation is one which reasonably may result in injury to any person, whether or not such person is a party to such action, grant a temporary restraining order upon such terms as may be just, pending the determination of the proceeding.” There is no reason to include in the statute the words “whether or not such person is a party to such action” unless a person other than the Attorney General has a private right to sue under Mental Hygiene Law § 31.21 (a). It is a basic rule of statutory construction that every word of a statute be given effect and considered (McKinney’s Cons Laws of NY, Book 1, Statutes § 231). In *427 interpreting a virtually identical injunction statute, Public Health Law § 2801-c, the Court of Appeals upheld a private right of action thereunder (Matter of Fritz v Huntington Hosp., 39 NY2d 339, 345-346 [1976]). In Carrier v Salvation Army (88 NY2d 298, 300 [1996]), relied upon by defendants, the Court of Appeals said that “[t]he narrow issue” before the Court was whether residents of an adult care facility subject to supervision by the New York State Department of Social Services had a private right of action to seek the specific remedy of appointment of a temporary receiver and held that they did not. That limited holding in no way compels a different result here.
To find that there is an implied private right of action to seek enforcement under a statute, a plaintiff(s) must show “(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme [citations omitted].” (Sheehy v Big Flats Community Day, 73 NY2d 629, 633-634 [1989].) Plaintiffs have demonstrated that they have such a right here.
The Mental Hygiene Law was recodified and substantially amended by Laws of 1977 (ch 978). The preamble and legislative findings state (L 1977, ch 978, § 1): “Protecting the mental health of the people of the state preventing the occurrence of mental illness * * * alcoholism and substance abuse * * * are matters of public concern.” They further declare: “It is the policy of the state of New York that all of its residents who are disabled will receive services according to their individualized needs.” These purposes apply as much to people incarcerated in the jails of New York City as other residents of our State. Thus, Mental Hygiene Law § 29.15 (f)’s providing for discharge plans for mentally ill inmates who receive treatment while incarcerated before they are released was enacted to include a benefit to those inmates, and recognition of an implied private right of action in those inmates would promote the legislative purpose in enacting the statute, especially where no explicit right to sue is provided to enforce Mental Hygiene Law § 29.15 (f). Creation of such an implied private right to sue would be consistent with the legislative scheme of protecting the mental health of all the people of our State, including mentally ill inmates who are treated in jail, and providing them with individualized services, including written discharge plans.
14 NYCRR 587.1 provides that it is the purpose of outpatient programs under 14 NYCRR part 587 to diagnose and treat *428 mentally ill individuals on an ambulatory basis, with the goals of reducing symptoms and maximizing the potential of those persons to recover meaningful social involvement in order to maintain their capacity to function in the community. Similar to recognition of an implied private right of action to obtain enforcement of Mental Hygiene Law § 29.15, doing so for 14 NYCRR part 587 would benefit plaintiffs and the class, promote the administrative purpose in enacting the regulations, and would be consistent with the administrative scheme.
Plaintiffs have demonstrated a likelihood of success on the merits. Particularly important, defendants acknowledged that as a matter of practice they are not providing discharge plans for inmates released from New York City jails.
Mental Hygiene Law § 29.15 (f) applies to “psychiatric inpatient services subject to licensure by the office of mental health.” Defendants provide such services by housing inmates with mental health problems in segregated treatment units in the New York City jails, separate from the general prisoner population, and in psychiatric wards of defendant HHC’s hospitals.
Mental Hygiene Law § 31.02 determines whether a facility is subject to licensure. Inpatient psychiatric wards of defendant HHC fall under Mental Hygiene Law § 31.02 (a) (2). The segregated jail units fall under Mental Hygiene Law § 31.02 (a) (1). Just because the Commissioner of Mental Health (Mental Hygiene Law § 1.03 [2]) may not require some of those facilities to obtain an operating certificate, for whatever reason, does not mean that they are not “subject to licensure.” The psychiatric wards of defendant HHC are operated “for the purpose of providing residential * * * services for the mentally disabled” (Mental Hygiene Law § 31.02 [a] [2]), and the segregated mental health unit of each New York City jail is operated as “a residential facility or institution * * * for the care, custody, or treatment of the mentally disabled” (Mental Hygiene Law § 31.02 [a] [1]).
Defendants argue that certain provisions of Mental Hygiene Law article 29 demonstrate that section 29.15 (f) cannot apply to the New York City jails. However, Mental Hygiene Law §§29.13 and 29.15 (a) and (c), for example, apply only to departmental facilities operated by the New York State Department of Mental Hygiene. Mental Hygiene Law § 29.15 (f) applies more broadly to “clients at developmental centers, patients at psychiatric centers or patients at psychiatric inpatient services subject to licensure.” Any rights that the *429 Commissioner of Mental Health would generally have to transfer, discharge, or conditionally release patients, pursuant to Mental Hygiene Law §§ 29.11 and 29.15, would fall to the more specific control of the prisoners in the jails of New York City by the New York City Commissioner of Correction in whose custody the prisoners and jails are charged (NY City Charter § 623 [1], [3], [4], [5]).
Defendants argue that, because Mental Hygiene Law § 31.07 authorizes the Commissioner of Mental Health to conduct investigations of mental health providers who are required to be licensed under Mental Hygiene Law article 31, and to make inspections and examine records, Mental Hygiene Law § 29.15 (f) and § 31.02 cannot apply to the mental health units of the New York City jails. Defendants argue that would allow the Commissioner of Mental Health to make unannounced visits to the jails, in violation of Correction Law § 500-j, which does not include the Commissioner among those who may visit jails. That statute does allow the Commissioner of Mental Health to visit the areas of New York City jails where prisoners are confined because that law does allow visits by unspecified persons “otherwise authorized by law.” Mental Hygiene Law § 31.07 is such a law. The argument must fail.
14 NYCRR part 587 applies to outpatient treatment for persons with mental illness. 14 NYCRR 587.3 (a) states that part 587 “applies to any provider of service which operates or proposes to operate a nonresidential outpatient program in which staff are assigned on a regular basis to provide services for the treatment of adults with a diagnosis of mental illness.” Defendants make those assignments and provide those services at the New York City jails. In particular, 14 NYCRR 587.8 (e) specifically provides for crisis intervention services at a clinic treatment program satellite “located in a local correctional facility.”
Those mentally ill inmates of the New York City jails who receive treatment not as inpatients in facilities of defendant HHC or segregated units in the jails are treated on an outpatient basis. Thus, 14 NYCRR part 587 applies to them. They also are entitled to discharge planning (14 NYCRR 587.4 [c] [7]; 587.7 [a]; 587.16 [e] [5]).
Defendants contend that the provision of discharge planning may delay the release of prisoners beyond the dates that they are due to be released. However, as plaintiffs counter, discharge planning could begin as soon as treatment starts. In any event, as plaintiffs and the class members have a constitu *430 tional and statutory right to be released when the date thereof becomes due, discharge planning will have to occur in a manner that does not hold up the release of plaintiffs and the class.
As Mental Hygiene Law § 29.15 (f) and 14 NYCRR part 587 apply to plaintiffs and the class, and it is undisputed that defendants are not complying with their obligations thereunder, plaintiffs have shown a likelihood of succeeding on the merits of their statutory and regulatory claims. Thus, pursuant to a maxim of constitutional law, the likelihood of success on the constitutional claims raised by plaintiffs shall not be decided (see, People v Felix, 58 NY2d 156, 161 [1983]).
Plaintiffs and the class only have to demonstrate “a potential” that irreparable injury will result if a preliminary injunction is not awarded to them (Chernoff Diamond & Co. v Fitzmaurice, Inc., 234 AD2d 200, 201 [1st Dept 1996]). Defendants are not providing needed mental health services and other supportive assistance to plaintiffs and the class. It is not only to their benefit to provide them with a discharge plan but to that of all of us if such a plan can aid at least some of the plaintiffs and the class to become healthier and thus more productive members of society who are not harmful to themselves and/or others. Plaintiffs and the class have shown through their expert, personal, and documentary submissions that irreparable injury will occur to plaintiffs and the class if their release occurs from the New York City jails without any mental health discharge planning. The FY 1996 Local Government Plan Adult Mental Health Services of defendants the City of New York; Rudolph W. Giuliani, Mayor of the City of New York; New York State Department of Mental Health, Mental Retardation and Alcoholism Services; and Dr. Neal L. Cohen recognizes this in stating:
“For the vast majority of these clients transition [between confinement and the community] is left to them. Transition fails for the vast majority of these clients. Keeping in mind that these clients are people with serious psychological problems who have only been able to function in a highly structured prison environment, it is no surprise that they are unable to make a successful transition to the community and community services without assistance * * *
“However, the greatest and most catastrophic gap is the failure in transition. While services may be sufficient, forensic mental health clients do not get those services because they do not get to those services. There is no effective transition from services received while incarcerated to services in the community.”
*431 The irreparable harm without an injunction requiring mental health discharge planning would be decompensation for many former inmates, and a return to the cycle of likely harm to themselves and/or others, through substance abuse, mental and physical health deterioration, homelessness, indigence, crime, rearrest, and reincarceration. So what do defendants do with members of plaintiffs and the class rather than providing them with a discharge plan? Defendants drop them in the middle of the night at a subway station with $3 in tokens or MetroCard fare.
The equities balance in favor of plaintiffs and the class. The comparative harm is greater to them than any increase in bureaucratic work and cost to defendants (see, Varshavsky v Perales, 202 AD2d 155, 156 [1st Dept 1994]; Borenstein v Rochel Props., 176 AD2d 171, 172 [1st Dept 1991]). Both the Rikers Island jail, for HIV-positive inmates, and Cook County in Illinois, for all of its inmates, are able to implement discharge planning, and the County of Nassau is preparing to do so too for its prisoners. Defendants have not complained that they do not have sufficient funds to implement discharge planning, and, even if they did, that would not necessarily compel a different result (see, Doe v Dinkins, 192 AD2d 270, 276 [1st Dept 1993]; cf., Klostermann v Cuomo, 61 NY2d 525, 536-537 [1984] [same on a motion to dismiss the complaint in a declaratory judgment and mandamus action]).
Defendants claim that the granting of a preliminary injunction would be an inappropriate award of the ultimate relief in this action. Although awarding of such an injunction would be ultimate relief for some plaintiffs and class members, the failure to do so would render any judgment in their behalf ineffectual (CPLR 6301) because some would be discharged from incarceration before a final judgment is promulgated in this action (see, Doe v Dinkins, supra, at 275).
Therefore, a preliminary injunction should be awarded to plaintiffs and the class enjoining defendants from violating Mental Hygiene Law § 29.15 and 14 NYCRR 587.1 et seq. as to discharge planning for plaintiffs and the class, and enjoining defendants to provide plaintiffs and the class with adequate discharge planning in compliance therewith. Before an injunction can take effect, plaintiffs and the class must give an undertaking (CPLR 6312 [b]). Under the circumstances, the court has set the undertaking at $1. Some significant discovery has occurred, but to move this action toward a swift resolution, a conference will be scheduled.